*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

J-DA CROSKEY, a minor, by Next Friend, DARCELL EALY,

Plaintiff-Appellant,

and

FELICIA CROSKEY, ALEXIA CROSKEY, a minor, by Next Friend, DARCELL EALY, and MAYA CROSKEY, a minor, by Next Friend, DARCELL EALY,

Plaintiffs,

v

JAMES EDWIN TANK,

Defendant-Appellee.

UNPUBLISHED
September 18, 2025
1:15 PM

No. 371418
Wayne Circuit Court
LC No. 23-006052-NI

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

LETICA, J. (*concurring in part*; *dissenting in part*)

I would affirm the trial court's order granting summary disposition in defendant's favor. I agree with the majority that the trial court erred when it determined there was no genuine issue of material fact that 14-year-old J-Da Croskey's herniated disc failed to reflect an "objectively manifested impairment of an important body function," MCL 500.3135(5). *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010). I further agree that J-Da's chest/breathing claims were not objectively manifested. *Id*. But, unlike the majority, I would affirm the trial court's determination that there was no genuine issue of material fact on the question of whether J-Da's disc injury affected her general ability to lead her normal life; it did not.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As the majority notes, this accident occurred on June 27, 2022. Felicia Cropsey slowed her vehicle for a traffic light when she was rear-ended by defendant James Tank, who was suffering

a diabetic episode, but managed to apply his brakes before impact. The damage to Felicia's vehicle was minor. J-Da and her 12-year-old sister, Maya Cropsey, were restrained in the back seat. Fifteen-year-old Alexia Cropsey was in the front-passenger seat. Despite not reporting any injury at the accident site, Felicia, Alexia, and J-Da all went to the hospital.

There, Felicia complained of "neck pain" and said she "had some whiplash." A computer tomography scan (CT) showed no acute fracture; however, Felicia's degenerative joint disease was noted. Regardless, Felicia "had full range motion of her neck." Felicia was informed that she could use a pain reliever and heat or ice.

Alexia complained of "some mild neck pain" and "a mild headache." Pain control, ice, and heat were discussed with Alexia.

J-Da also complained of "some mild neck pain;" however, her chief complaint was a headache. J-Da denied striking her head during the accident, but she would later testify that she had struck her head and chest. At the hospital, the doctor noted that J-Da had "[n]o CT or L-spine tenderness[,] no bony tenderness to [her] upper low extremities" and she had "some mild paraspinal neck tenderness[,] but a full range of motion of the neck . . . ." J-Da was given Tylenol and directed to follow up with her pediatrician. Felicia, J-Da, and Alexia were all discharged from the hospital.

The day after the accident, Felicia took Maya, who was now complaining of "left shoulder and low back pain" to the hospital. The doctor's differential diagnosis included "spasm," "musculoskeletal injury," and "soft tissue injury." Maya was given Tylenol and sent home.

The following day, June 29, 2022, Felicia took all three of her daughters to New Grace Spinal Rehabilitation (New Grace) for chiropractic treatment. New Grace was about six miles from Felicia's home, approximately a 15-minute drive one way. The New Grace records reflect that the girls also received treatment on July 1, 6, 8, 11, 13, 15, 18, 20, 22, 25, 27, and 29, 2022.[1] Their treatment continued on August 1, 3, 5, 8, 10, 12, 15, and 17, 2022.

J-Da also visited BMC Family Medicine in Westland (BMC) on July 7, 2022. She complained of back pain and difficulty breathing. J-Da was advised to continue using over-the-counter pain medications as well as hot and cold compresses, and she was discharged.

On July 26, 2022, as ordered by Dr. Michael Meeron, J-Da had an MRI. On August 12, 2022, the reviewing physician opined that J-Da had a herniated disc.

On August 17, 2022, Felicia reported to New Grace that her daughters were returning to school and "due to the distance and hours, it would be very, very difficult for J-Da to continue [with the] current treatment." More specifically, for the previous five weeks, the girls had received chiropractic services three times each week. New Grace advised Felicia to seek ongoing care or

---

[1] In contrast to Alexia's New Grace records, which appear complete, we only have certain records for J-Da and even fewer records for Maya.

return to her primary care physician. New Grace provided no further treatment, noting that Felicia would try to find a location "that is open on Saturdays."

On Monday, October 3, 2022, J-Da had imaging of her chest to address "[c]hest pain" or "discomfort." The reviewing doctor concluded that everything appeared "normal."

On June 29, 2023, J-Da returned to Oakwood Hospital and Medical Center, complaining of "sharp right sternal chest pain with 'crackling' worsened with deep inspiration and movement, with no improvement with Motrin/Tylenol." It appears that J-Da had also been there on July 10, 2022, with the same complaint and had been recommended to continue "supportive therapy." J-Da now reported that her "seatbelt did not lock in place [in Felicia's vehicle] and she was thrown forward and back into her seat, hitting her back." She also said that she was "unaware if she hit her head" but admitted that she did not lose consciousness. She described following up with the "chiropractor for massage, therapy gun, and wave bed without alleviation of symptoms." J-Da denied "neck pain" or "other symptoms" during that visit.

Finally, on August 18, 2023, J-Da returned to BMC for an office visit "to discuss intermittent right chest pain that began in June 2022, following [the accident]." J-Da reported that the "pain is everyday [sic] for at least an hour, and occurs when she stands or lays down for too long, or with deep inspiration." J-Da had noted some shortness of breath "associated with the chest pain." She had used "heat and ice without relief" and "[s]he ha[d] not tried medications or [physical therapy] for pain relief." J-Da further shared the earlier MRI results. BMC noted that J-Da had a "[n]ormal range of motion" and "[n]o rigidity or tenderness" as to her cervical spine. BMC instead noted the existence of "[r]ight posterior rib dysfunction at rib 9, 10[.]" To address that issue, BMC offered nonsteroidal anti-inflammatory drugs, physical therapy, and/or Osteopathic Manipulative Medicine. J-Da selected the pain-relief medication and physical therapy, but indicated that she might also return for the osteopathic treatment. BMC recommended J-Da take children's Motrin twice a day. The record does not reflect that J-Da actually engaged in the physical therapy or the osteopathic treatment.

After discovery concluded, defendant separately moved for summary disposition under MCR 2.116(C)(10) as to J-Da and her sisters.[2] Regarding J-Da, plaintiff responded:

> J-Da's life changed for the worse after the accident. She was an active young high school student who ran track and enjoyed spending time with her friends before the accident. Following the accident[,] she was unable to hang out with her friends because of all the doctor appointments she had to manage her pain. Her ability to run track has also changed as now she has more shortness of breath following an activity, and has less stamina than before the accident.

---

[2] The suit involving Felicia eventually settled.

-3-

Plaintiff raised the same argument regarding Alexia, who had testified during her deposition: "I wasn't able to go anywhere during that summer because I was attending physical therapy[3] most of the time." Asked where she would have gone, Alexia replied: "Maybe out with my friends or normal activities such as summer sports. Where I was going with friends was, like the mall. Like, just stuff like that."[4]

During oral argument on defendant's motions for summary disposition, the trial court observed:

> According to Alexia's deposition, she missed a few weeks of work after the accident as a waitress and couldn't go out for the summer after the accident because she was in physical therapy. So it sounds like the injury didn't interfere; it was the treatment that interfered.

And, as to J-Da, the following exchange occurred:

> THE COURT: Okay. With regard to J-Da, she did go to the emergency room after the accident. However, there is nothing remarkable noted in the records. She treated again with the same chiropractor. She also had an MRI. The chiropractor signed an affidavit stating that, again, "I believe with medical certainty the following findings of J-Da, cervical spine MRI were caused by the accident."
>
> The MRI found acute herniated cervical disk narrowing the left neuroforamen encroaching on the left C-5 existing nerve, along with other ligament injuries.
>
> J-Da testified at her deposition that she ran track and sometimes had chest pain. And she also claimed injury to her right eye and ear, but never received treatment or a diagnosis concerning her alleged injury. And, again, regarding all -- oh, I'm sorry.
>
> Is there anything anyone would like to add with regard to J-Da?
>
> [Plaintiff's counsel]: Yes. I would just like to add that after the accident it did affect her track ability. She had some more shortness of breath and just she felt like she had less stamina following the accident in regards to her ability to run track.

---

[3] Because there are no records pertaining to any other therapy, it appears that Alexia was referencing the chiropractic sessions.

[4] I note that Felicia, who had previously been involved in a separate automobile accident that resulted in serious injury to her, testified during her deposition that she was "traumatized" by the accident in this case. In fact, she was "just not interested in doing anything, because [she] [did]n't want to go out and drive." Curiously, Felicia later testified that she did take her daughters to "meet up with their friends." So she had "to take them," even though it was stressful for her. She could not "cut their lives off short because of [her] trauma. . . ."

[Defendant's counsel]: Your Honor, I mean I would just counter with the fact that, you know, she never missed any school. She was still able to run track. She still ran all her events. You know, even if there is an objective injury here, again, if we get to the threshold[,] I don't think this is serious impairment. I don't think the Plaintiff would reach the burden here.

Thereafter, the court granted the defendant's motion for summary disposition as to all three girls, ruling:

Regarding all of the Plaintiffs, none treated more than a month or two.

* * *

Alexia, Maya and J-Da have the chiropractor notes and affidavit, but very little impact on their ability to lead a normal life.

Alexia missed a few weeks of work. Maya testified to no impact. J-Da does have an MRI with an objective finding relating [her] problems to the motor vehicle accident, and she did testify she was experiencing some pain in her chest while running, but she still ran. The pain did not keep her from running, apparently.

* * *

Anyway, the Court is going to grant the motion on the threshold issue. There is either no objective manifestation or no affect [sic] on their ability to lead their normal lives.

Later, plaintiff moved for reconsideration, contending that J-Da, Alexia, and Maya suffered an objective impairment. And, as to J-Da and Alexia, plaintiff further argued that their ability to live their lives was impacted for the same reasons stated in the previously filed answers to defendant's motions for summary disposition. Plaintiff relied on *Piccione v Gillette*, 327 Mich App 16; 932 NW2d 197 (2019), to argue that there were "no time-related boundaries with respect to how long the impairment must last in order to satisfy MCL 500.3135(5)," citing *McCormick*, 487 Mich at 203 ("the statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on []the person's general ability to live his or her normal life").

The trial court denied plaintiff's motion for reconsideration. In doing so, the trial court determined that the motion "present[ed] nothing that the Court did not previously consider when ruling on Defendant's summary disposition motion[s] on the threshold issue."

Thereafter, plaintiff filed an appeal only challenging the trial court's dismissal order as to J-Da. Plaintiff's argument remains the same, J-Da's general ability to live her normal life was impacted because she did not have time to spend with her friends in the summer of 2022 in light of her chiropractic appointments.

-5-

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Charter Twp of Pittsfield v Washtenaw Co Treasurer,* 338 Mich App 440, 448; 980 NW2d 119 (2021). A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Id*. at 449. The moving party must identify and support the issues to which the moving party believes there is no genuine issue of material fact, and the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Id.* Once the moving party makes and supports its motion, the opposing party may not rest on mere allegations or denials in the pleadings, but must submit documentary evidence setting forth specific facts to demonstrate a genuine issue for trial. *Id.* (quotation marks and citation omitted). See also MCR 2.116(G)(4) ("When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial.").

## III. ANALYSIS

Our state's no-fault act, MCL 500.3101 *et seq*., provides a person injured in an automobile accident with two potential claims: a first-party claim or a third-party claim. A first-party claim involves a claim against the responsible no-fault first-party insurer for benefits payable for certain economic losses. MCL 500.3105. A third-party claim, which may be brought under limited circumstances and to seek limited damages, involves a claim against an automobile driver who is the tortfeasor involved in an automobile accident. MCL 500.3135.

Our Supreme Court previously described how the "no-fault act seeks to improve upon traditional tort liability," stating:

> Through the insurance made compulsory under the act, the Legislature assured adequate recovery without regard to fault for economic losses. Medical expenses are covered, as are basic wage losses. By specifying who is to pay and how much is to be paid, litigation concerning these matters generally becomes unnecessary, especially since negligence is no longer an issue. The problem of undercompensating serious injuries is remedied to the extent that recovery for economic loss is assured.
>
> The act does not, however, assure payment for all economic losses, nor for non-economic losses. This is significant, for it shows a policy determination on the part of the Legislature that a specified recovery for basic economic losses is of primary importance. Nevertheless, it is apparent that an injured person may suffer significant losses other than those for which the act guarantees recovery without regard to fault. For economic losses beyond those for which payment was assured, the traditional tort remedy was left intact. However, the traditional tort remedy for non-economic losses for which no payment was assured under the act was not left wholly intact.

At least two reasons are evident concerning why the Legislature limited recovery for non-economic loss, both of which relate to the economic viability of the system. First, there was the problem of the overcompensation of minor injuries. Second, there were the problems incident to the excessive litigation of motor vehicle accident cases. Regarding the second problem, if non-economic losses were always to be a matter subject to adjudication under the act, the goal of reducing motor vehicle accident litigation would likely be illusory. The combination of the costs of continuing litigation and continuing overcompensation for minor injuries could easily threaten the economic viability, or at least desirability, of providing so many benefits without regard to fault. If every case is subject to the potential of litigation on the question of non-economic loss, for which recovery is still predicated on negligence, perhaps little has been gained by granting benefits for economic loss without regard to fault.

Regarding the trade-off involved in no-fault acts, 7 Am Jur 2d, Automobile Insurance, § 340, p. 1068, contains the following:

> "It has been said of one such plan that the practical effect of the adoption of personal injury protection insurance is to afford the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses * * *. In return for this he surrenders the possibly minimal damages for pain and suffering recoverable in cases not marked by serious economic loss or objective indicia of grave injury, and also surrenders the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he may be able to reap a monetary windfall out of his misfortune." (Footnotes omitted.)

Thus, it is apparent that the threshold requirements for a traditional tort action for non-economic loss play an important role in the functioning of the no-fault act. [*Cassidy v McGovern*, 415 Mich 483, 499-501; 330 NW2d 22 (1982), overruled in part *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986), and superseded by statute (Footnotes omitted.)]

With this background, I turn to MCL 500.3135, which governs third-party claims. In pertinent part, it provides:

(1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

(2) For a cause of action for damages under subsection (1) . . ., all of the following apply:

-7-

(a) The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(*i*) There is no factual dispute concerning the nature and extent of the person's injuries.

* * *

(5) As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:

(a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.

(b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.

(c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

MCL 500.3135(5)(c) is at issue here. This provision "merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed." *McCormick*, 487 Mich at 202. Therefore, "courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. at 202. Relatedly, the word " 'general' modifies '*ability*,' not 'affect' or 'normal life.' " *Id*. The statute's plain language "requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected. Thus, while the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is, there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*. at 202-203.

During J-Da's deposition on August 11, 2023, the following exchange occurred:

> *Q* [Defendant's counsel:]. Did this [June 27, 2022] accident affect your ability to do track in the spring of 2023?
>
> *A* [J-Da:]. Yes.
>
> *Q*. How so?

*A.* My breathing.

*Q.* Tell me more about your breathing.

*A.* Like, just shortness of breath. And sometimes my – like, it would just – like, my chest would just hurt.

**Q. Any other hobbies or activities that you did before the accident that were affected by the accident?**

**A. No.**

*Q.* Just the track?

*A.* Yeah.

*Q.* Did you run track in middle school?

*A.* Yes.

*Q.* Were your times better your freshman year or in middle school?

*A.* Freshman year.

**Q. What did you do this summer [the summer of 2023]? Any camps or anything like that?**

**A. Mostly go out with my friends, like, to movies, like, two times. And, like, three carnivals just to meet up with friends.**

**Q. Has your ability to be with your friends been affected by this accident?**

**A. Yes.**

**Q. Okay. How so?**

**A. Because last summer when we got in the car accident we only went to the chiropractor only, not out.**

*Q.* So last summer -- okay. Strike that.

How about this summer 2023, has your ability to hang out with your friends been affected?

*A.* No. (Emphasis added.)

In moving for summary disposition under MCR 2.116(C)(10), defendant relied upon J-Da's deposition testimony that the accident did not impact her pre-accident activities and hobbies.

-9-

Plaintiff responded by pointing to J-Da's testimony that she "enjoyed spending time with her friends," and added that "[f]ollowing the accident [J-Da] was unable to hang out with her friends because of all the doctor appointments she had to manage her pain." But, reading J-Da's testimony in context, she described how the time she had to spend "go[ing] out with . . . friends" during the summer of 2022 was spent with a chiropractor.

As our Supreme Court explained in *McCormick*, 487 Mich at 202, "[d]etermining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident." Here, the sole impact claimed related to the time a teenager had to spend with her friends during the summer of 2022. The trial court correctly recognized that J-Da did not receive chiropractic treatment for more than two months. Specifically, in the eight weeks from June 29 through August 17, 2022, J-Da had 21 chiropractic appointments. For the first two weeks her sessions were on Wednesday and Friday. For the following five weeks, they were on Monday, Wednesday, and Friday. For the last week, they were on Monday and Wednesday. Thus, in the 63 days between the date of the accident and the first day of school,[5] J-Da had the remaining 42 days free to spend time with her friends. Further, in response to defendant's motion for summary disposition, plaintiff did not provide an affidavit or records for J-Da to show exactly how long her chiropractic treatments lasted or to establish that she was restricted from spending time with her friends on those days. *Charter Twp of Pittsfield*, 338 Mich App at 449; MCR 2.116(G)(4). At best, the record, which appears to contain complete chiropractic records for Alexia, reflected that one of the procedures she had had could take either less than 8 minutes or 15 minutes. Alexia had multiple procedures, but no time was listed for them. Accepting that plaintiff's sisters received chiropractic treatment from the same treater, plaintiff nevertheless had time on treatment days to spend time with her friends.[6] Accordingly, the record evidence indicates that J-Da's general ability to live her normal life was not affected by her impairment nor was her general ability to do so affected.

Finally, plaintiff's reliance on *Piccione* is misplaced. As explained by the majority, the three-year-old child in that case was unable to go to school for approximately two weeks and, when he returned to school, he was unable to use the playground equipment. *Piccione*, 327 Mich App at 21. Further, the child now required toileting assistance, could not dress himself, and even needed assistance going up and down the stairs. *Id*. at 21-22. The child's ability to sleep without pain was also compromised. Lastly, the child stopped coloring and was unable to ride his bicycle, play soccer, or play with his scooter. *Id*. at 22. The child's impairments spanned three or four months. *Id*. at 22.

On the other hand, in this case, plaintiff contends that teenaged J-Da's ability to spend time with her friends, which in 2023 involved seeing two movies and attending three carnivals, was

---

[5] The Wayne-Westland Community Schools first day of classes was Monday, August 29, 2022. <https://www.facebook.com/wwcsd/posts/the-2022-2023-school-year-calendar-dates-are-posted-here-httpswwwwwwcsdnetour-dis/4788122201289967/> (accessed August 11, 2025). See MRE 201.

[6] Because chiropractic time was specifically referenced, J-Da's other medical appointments in the pertinent timeframe are also days when friend outings could have potentially occurred.

limited during the eight-weeks she received chiropractic treatment. Because there is no factual dispute concerning the nature and extent of J-Da's injury and its impact on her ability to live a normal life, this issue presented a question of law for resolution by the court. See MCL 500.3135(2)(a)(*i*); *Patrick v Turkelson*, 322 Mich App 595, 607-608; 913 NW2d 369 (2018).

I cannot conclude that the trial court erred when it determined, on the undisputed facts, that J-Da's general ability to lead her normal life was not affected, despite her contention that she lacked time to spend with her friends by enjoying a couple of movies or a few carnivals in the summer of 2022. As already discussed, J-Da had sufficient time outside of the chiropractic treatment hours to engage in activities with her friends. Moreover, as J-Da herself confirmed during her deposition, none of her "other hobbies or activities that [she] did before the accident . . . were affected by the accident." Cf. *McCormick*, 487 Mich at 217-218 (an inability to engage in hobbies at the same skill level and an inability to attend to personal needs may establish the plaintiff's impairment affected their ability to lead their "normal life.").

On this record, I would affirm the trial court's order granting summary disposition in defendant's favor.

/s/ Anica Letica